3-090559, Pat Ashley and Scott Wackel, Appellant John Ridge v. IM Steel, Inc. et al. at the Lee-Brett Homestead. Mr. Ridge. Good morning, Your Honors. May it please the Court and Counsel, I'm John Ridge. I represent Pat Ashley, Scott Wackel. They were in the, they sold steel for a company by the name of Global Steel Trading. Basically, this case starts out as an Illinois Wage Payment and Collection Act case, then it morphs into an Assignment for Benefit Accreditors case. And my clients, they worked for Global Steel for about 22 months. They got about $6 million in new business for Global Steel and about 53 new accounts. And then one day, they had noticed that, actually they were told by a customer that GST had done an Assignment for the Benefit Accreditors. And it was their understanding on the front end that it would be business as usual. They would then be working for another company, this IM Steel. But basically, it turned out to be not true. Basically, they had accumulated about $128,000 in wages or commissions due to them from Global Steel that they found out were not going to be paid because of the ABC. The issue, and so basically, and their wages were cut, and one of the largest things they acquired was a contract. They had about $1.3 million of Manitowoc cranes, and then they had, they were looking at a contract where they were guaranteed like $6 million a year for three years from Manitowoc if they could produce. And all that fell apart with the ABCs simply because of, they had other suppliers that So, but as I say, basically, it starts out under the Wage Act, but goes into ABCs, and the issue then becomes, can an ABC trump the Illinois Wage Payment and Collection Act? And the, when you look at an ABC, it's, you know, it's pre-bankruptcy law. It's a, it depends on a voluntary transfer. A company takes all its assets, puts it over with a And in this particular fact situation, you had the, the secured debt was American National Bank for about $9,800,000. Well, and we're looking at, this is both companies, Global Steel and Bellson, which are like brother-sister corporations, and they both did ABCs on the same day. And if, what I'm saying is if you combine them, ask yourself why they do ABCs, they're combined, they had a net worth of about $1 million combined. And as I say, the debt was cross-collateralized all to American National Bank, and that was $9,800,000. And then you had the unsecured creditors for about $5,800,000. And so my clients, you know, basically we filed claims asking for the money, even if it was pro-rata, but we found out that there was no money. No unsecured creditor got paid. It was just totally, totally wiped out. And we started looking at that and it didn't make sense to us. And so one of the first questions that, one of the first issues here is can ABC trump the officer liability created by the Illinois Wage Payment and Collection Act? And I would suggest no, because we gave you that one case, O'Brien v. Incon Construction, where they talk about, well, we're going to have to limit some individual contract rights, you know, if we're going to fully implement the guarantee people under the Illinois Wage Payment and Collection Act are paid. And so what I'm saying is I don't think you can do a voluntary ABC. I think there is nothing on this issue. It's like new law if we have it. Can you do, can you voluntarily do an ABC benefit accreditors and not pay people under the Illinois Act? Can you voluntarily file bankruptcy? Well, yes, you can. And what's that do to the Wage Act? The, I would, well, when you, all right, if you were to do that, you would look at preferences. And that's exactly what happened in this case. They, for example, GST, who owed the money, paid a million dollars two weeks prior to that over to a sister corporation, Bellson. All right? Now, under bankruptcy, they go reshuffle that and put it back where it belonged. Okay. Well, I guess just so you're clear, I don't want to confuse you, but where I was going with the question was, I mean, is it just the fact that the ABC is voluntary? Is that really the deciding thing? Because you can have a voluntary bankruptcy. Right. No, the issue, I'll get into that issue. The, I think the case that we're, that we're, you might be thinking of is this Andrews versus Cowell printing, where the bank seized all the assets. All right. And he had outstanding and individuals filed under the Wage Act. In that case, and the Supreme Court said, no, we aren't going to hold the officers liable because the bank came in and absolutely seized everything. Now, that's different from this case where a guy plans out. He plans out this voluntary act to give it all over to a trustee and not pay the employees. A big difference between here and, here and Cowell. The, and, and what I think, what I think is important here is if you look at it, he does the ABC on May, May 7, 2001. But prior to that, April 26, 2001, pays a million dollars over to, over to the Belson scrap and steal. And then there's another May, May 6, the day before the bankruptcy, they have a meeting with the shareholders of Belson and they declare a dividend. And that, that money also came out of GST. That was $133,000. And then a couple of days prior to that, he has his attorney execute articles of incorporation to start IM steal. All right. So basically this was all planned out. And when it comes to paying my clients, he says, oh, we have no cash left. Well, no, you gave it all away. I mean, you transferred it out, so it's not there. It's not available. So what I'm saying to you is, can you voluntarily do all of that? Does that, does that really count? And I think the answer is no. The, but then we get into, I think more importantly, if you're going to, you know, the directors of a corporation, they have this fiduciary duty, if you would, or duty. And when you, when you, when you claim insolvency now, that duty transfers to the creditors. They have a duty toward these creditors. And that was Mr. Posen. We're suing him individually here. The, the issue is, and we, we gave the, we gave the, the fiduciary duty of an officer or a director, really, is extended to creditors. And what's important here is, if you went in and looked at this ABC, it was totally self-dealing. Basically, Mr. Posen liquidated these two companies, started IM steal, and, and purchased, you know, just for an example, the inventory of the two companies, $3,800,000. IM steal purchased that. They got, they bought it at a 20% discount. All right. And they got paid a 35% commission for buying it. And that commission is like seven times higher than a normal commission. Then you had accounts receivable. They purchased the accounts receivable. They were all insured. The equipment, basically, it was a fire sale. That was Mr. Posen's words. He is, he is the director of both of these companies that did the ABCs. He is the president now of this new company buying all of these assets. But it's the trustee that's running the fire sale, isn't it? No, no, not, not if you, we deposed Mr. Posen and he said, after the assignment, he was the advisor, all right, for the trustee. He worked for the trustee, if you would. He got paid commission by the trustee for his company that IM steal. Mr. Posen, his health insurance premiums were paid by the trustee. He gave advice on how the trustee should collect the money. He gave advice on what insurance should stay in place, how the auction should be handled. He gave advice on how that auction should be done and to liquidate these assets. And basically, he came in and he bought these assets for pennies on the dollar. You know, there's one example in there. It's a shredder that they had a, had a liquidation value of $400,000. Mr. Posen bought it for $25,000. That's six and a half cents on the, on the dollar. I mean, and, and it's worse yet. Was this a public auction though? Yes, it was. Supposedly it was a public auction. Supposedly. The, it was held, possibly it was held right after 9-11, which may have been one of the, one of the factors. But the, and it gets given away to who? To the director of the, of these two companies. It's, what, what you have here is classic self-dealing. And we, we give, we give the court two cases on this. This Wardell versus the railroad where, where the issue is you can't, you can't occupy, you can't be a buyer and a seller. He certainly is the buyer for IAM. And he is the, he's still a director of these companies. I mean, if there's money left, if they, if they liquidate everything and pay off these, these claims or unsecured creditors or all, all the creditors and there's money left, it goes back to the company. It goes back to the stockholders. I mean, I certainly get what you say in, in looking at these numbers, but to get where you're going, don't we almost have to conclude that the trustee was just a shell, that, that he was just a shell for the defendant? Oh, well, wait. Those are your facts. We went on, Your Honor, the, we, we, we cited McIntyre versus Benson. And we, we showed you the clause that they had in the, in the assignment where the trustee incurs no personal liability for any of his acts. I mean, you just, there's a case right on point. There, the clause that they had, like, like I could read it, I guess, but it is understood and agreed that the trustee assignee is to assume no personal liability or responsibility for any of his acts as trustee assignee herein. And it goes on. That's exactly what he was. What, he, he has a duty. Is that a question? I'm sorry. Is it a question that this guy was just a, you know, in collusion with the defendant or whether he was? Well, I, basically when you got into the McIntyre case, they read that and they said, hey, I mean, that's just, that's a badge of fraud is what it is. We're going to let the, the trustee assignee off on it because he has no duties. And when you put a paragraph like that in the, in the ABC agreement, that's, it's a, it's, it's, it's a badge of fraud. It's an indice of fraud. Counsel has two minutes. The, so what I'm saying here is because of the relationship of Mr. Posen starting his new corporation, being a director of the old ones, and he is the primary purchaser of everything, you can't wear two hats. And basically they set it up. You know, you take down American National Bank, they get paid their hundred percent. They don't care about the other $5.8 million to the unsecured. Nobody got paid, no unsecured creditor got paid. And, and then the other issue we, we, we looked at was, just to be quick about it, is the, a trace report, the IM is a mere continuation of the, of the GST and Belson, which, which they were. If you went and looked at all the attributes, that's exactly what they, they started business immediately. The, and, or number four, under this, why IM should be liable for the debts of GST and Belson, is the transaction was really just an attempt to defraud the creditors of, of GST and Belson. And that's exactly what they did. They, you basically, you have, you have Mr. Posen walking away with all this equipment and property and inventory. It's like a break-even deal. He put nothing down and now he's a millionaire. And his first, on the first, his first tax return, I think he showed a quarter million dollars in profit for, for, on his, on his 1040 in that year. And his company, IM, in the first six months of operation, they have like a half a million dollars in profit. So what I'm saying is that all you have to do is look at the facts or look at the wording in the ABC, and that's exactly what he was. The trustee wasn't independent. And I'd ask you to, to reverse Judge Winslow's rulings. And, and probably one last thing. If you went through and you looked at the, there's an exhibit in here. Phew. It's a settlement agreement. And IM is, is making a settlement for the liabilities to American National Bank for these two companies, Belson and GST. Why is IM in there? It's a party to it. It was all one big deal. Thank you. Mr. Olmstead? May I please report, counsel? This is purely a manifest void of the evidence appeal. Before you take off there, can I just ask you, why is IM, in response to Mr. Ridge's last observation, why is IM involved in settling, settling up matters between the bank and the two other corporations? Absolutely. The bank treated it as a settlement, an overall settlement with Mark Posen and every entity he was involved in. And the reason IM Steel is in there is because IM Steel was never paid one dime of cash for all of the steel that it sold in the liquidations. All of that money was held until this final settlement. And so IM Steel was owed a lot of money. It also purchased equipment at the public auction and hadn't paid for that because it had this credit in this account. And so the bank wanted to settle everything at once with one document and everybody signing it. And there wasn't anything wrong with that. And there wasn't anything improper about it. IM Steel was a separate entity from the beginning. It was treated as a separate entity by the bank. It was treated as a separate entity by Mr. Posen. And it was treated as a separate entity by the assignee. There was no legal issue presented in this appeal. There was no evidence that was wrongfully not admitted. There was no evidence wrongfully admitted. It's purely a manifest void of the evidence in this appeal. And there was an abundance of evidence in the record that the trial court could rely on in making the findings of fact that it did. And this case doesn't present a question of whether or not an assignment for benefit of creditors trumps the Wage Payment and Collection Act. There's no trumping. It's not one law over another. It doesn't have anything to do with contract rights. All of the claims that survived in the complaint that was active at the time of the trial were under Section 13 of the Wage Payment and Collection Act. They required that the plaintiff prove that Mark Posen individually knowingly permitted those commission payments to not be made. And the plaintiffs failed to meet their burden of proof, and that's what the trial court found. There was no evidence of dealing, self-dealing between Mark Posen and the assignee. The plaintiffs were never able to prove that the assignee was a shill. And, in fact, that was ridiculous. The evidence about Mark Posen advising the assignee about the auction, which was a disaster, were that Mark Posen told the assignee he was making a huge mistake, and the assignee said, I don't care. The assignee specifically ignored the advice that Mark Posen gave him. Mark Posen told him not to sell the equipment, and the equipment was a large part of the value of these two companies. And looking at GSD and Belsen, just as an aside, the only way to look at them is as one company. And that's how they were treated by everybody. They were one company. They were so cross-collateralized and connected that debt to one was debt to the other. And that's the way the bank treated it. That's the way the assignee treated it. That's why they both filed assignments for the benefit of creditors on the same day. It's the only thing that made sense. But a large portion of the value of these companies was in the equipment that they had. And that's why in the beginning, when the assignment's made, everybody expects all of the creditors to be paid. The appraisals, all of the estimates of value of the company would have the shareholders receiving money after everything was done. But no. One of the things that goes horribly wrong is the assignee, ignoring the advice of Mark Posen and the CFO, Kevin Connell, decides to go ahead with an auction that had been pre-scheduled for September 20, 2001. September 11 happens. It's Rosh Hashanah, and there's a big Jewish base in the steel industry. And there were a couple of other major steel auctions going on. And so what happens at that public auction? Well, Mark Posen's advice turned out to be correct. The prices that were received at the auction were grossly below the estimated value of the equipment that was sold. That wasn't Mark Posen's fault. Mark Posen tried to get the assignee to do something smart to achieve the maximum value. That's the assignee's decision, and it was a mistake. And that's part of the reason why the estimated values of the companies going in to the assignments was a lot greater than it was coming in. And that's what creates the lack of money to pay the unsecured creditors. The facts establish that the secured creditor, American National Bank, was not paid in full. You can see it in the settlement agreement. It was proved at trial. The secured creditor wasn't paid. That wasn't what was expected to happen at the beginning. It wasn't what was expected to happen by the bank. It wasn't what was expected to happen by Mark Posen individually. Can Mr. Posen or Mr. Posen have asked for that sale to be set aside if he knew that it was wrong or felt that it was wrong for the assignee to go forward with the sale because of the timing and the advice and everything that he'd given him? Didn't, as one of the officers, didn't he have a responsibility to ask to protect those assets for that sale to be set aside? He thought he was doing what he needed to do to try and protect, but he also thought it was out of his hands. Wasn't his other company one of the direct beneficiaries then of that lowball sale since they bought it? Item Steel came into the public auction and purchased a little over $600,000 worth, I believe, of the equipment. What hat was he wearing? What hat? For whose benefit was he wearing the day of the sale? The day of the sale, when he's there at the public auction, he's acting on behalf of Item Steel. That's right. And he was a consultant, correct? He was wearing his IM hat, consulting for the, I guess, must have had another hat on at the same time when GST was in need of a consultant because he's in your brief saying that I am Steel as a consultant during the liquidation process. That's correct. Mark Pozen consulted with the Assignee because he knew the businesses. And he was an officer of the business, and he had a responsibility to advise the Assignee according to the best of his ability. And the evidence of the trial was that he did that. Now, there is no law that required him to not come to the public auction or that required him to overbid. But he says, and your argument is that he knew or he believed that this was the wrong thing to do, yet he doesn't ask for that sale to be set aside? No. He doesn't ask for the protection of those assets? No, he didn't ask for the sale to be set aside. The companies were being controlled by the Assignee at that point. But he is one of the shareholders, and you're saying that, boy, there was just nothing he could do about that. Well, he's one of the shareholders of GST. You go into no shares of those. Right. But on behalf of GST, he never asked that this sale be set aside because he knew that it was going to be grossly undervalued when they go into the liquidation process. No, he didn't ask for the sale to be set aside, neither did the bank. And Mr. Pozen already knew. But he holds himself out as the expert. He isn't wearing his other hat. He knew the business. The bank doesn't know the business. I'm sure that as a consultant that he's the one saying, hey, I know how this business operates. So if he knows this sale is going to go down the tubes, but he also knows, hey, I'm going to be the beneficiary if I get into that public auction and I buy this on behalf of my other company. That's an excellent point. Does Mark Pozen have inside information that wouldn't be known to the bank that now he can use to advise the assignee, but then go into the auction and utilize that private information that he has? And the record is absolutely explicitly clear that that's not true. The bank had the appraisals. Everybody had the appraisals going in. Mark Pozen advised the assignee as to what the problems would be with the auction going in. And all of that's a guess. Assignee, this is not going to work. It's not going to work because of the other auctions, the other problems that are happening right now in the market. Then he goes into the auction, and it's not until the hammer starts falling that you realize what the prices are. And at that point, what's his obligation not generally or to the company, but to the plaintiffs in this case? He doesn't have one. He's there to bid on property at a public auction where a notice was sent out and other with the auctions from a fraud point of view. There was nothing with the auctions that showed that the assignee was a shill. Certainly was not a shill at Mark Pozen. And also, to look at these assignments for the benefit of creditors as some purely voluntary act to avoid a responsibility to the salespeople that were the plaintiffs in this case is just providing the line of credit that allows the companies to go forward by paying people, paying their debtors, paying suppliers for cash, operating cash. The bank is providing the operating capital. And beginning the year before, the steel industry took a downturn. This is all the evidence at the trial, and this is the trial court basis it's judgment on. There's a downturn in the steel industry. The bank agrees to overlook defaults. You get to April 2001. The bank says we're not overlooking your defaults anymore. Here's what you have to do. Mark Pozen and Kevin Connell and other people associated with the business tried to save it by reorganizing and trying to sell that idea to the bank. They started introducing that idea to their customers, and the bank wasn't having it. So what happens by the end of April is they start bouncing checks because the bank doesn't keep the line of credit anymore. That is not a voluntary act throwing your company at an asking me to avoid paying employees. The businesses could not go on. GST and Belson could not operate without the capital. That's what precipitates the assignments for benefit creditors. The plaintiffs try here, as they tried in the trial court, to find different badges of fraud within the different transactions. And the remarkable thing about the transactions all in here through the ACME and everywhere else is everything's out in the open. There are written agreements for everything. There are reams of paper involved in this case, exhibits in this case, paper everywhere for the bank, for the ACME to see. Everything is governed by a written agreement. The ACME had a written liquidation agreement with the bank. IM Steel had a written agreement with the ACME to do its sales work. And everybody knows that the bank is there watching over everybody's shoulders. IM Steel sold steel inventory that was held by the companies at the time of the assignment. It did that on the basis of a written agreement that was signed by the ACME. There was a commission of 35%. The plaintiffs wanted to use that number to imply fraud. That's not correct. And the only comparison they had was, look at that versus the commission they were paid. But that's apples and oranges. They were salespeople who went out, hit the road, made a sale, reported the sale, and then went on to the next customer. That is not what IM Steel did. IM Steel liquidated the inventory. And all this is not to mention the fact that IM Steel had to provide its own working capital through this entire period because it wasn't paid a dime. Till the end, when it all was settled in the overall settlement agreement, it was an arm's length transaction and there really was no evidence to the contrary. And certainly not evidence where this court could say that what the trial court did was an abuse of discretion against a manifest weight of the evidence. And IM Steel was not a continuation company. There's no reason why the trial court shouldn't have been able to make that finding of fact in the evidence in this case. The shareholders were different. Mark Pozen owned 100%. Mark Pozen owned a minority of GST and owned none of Belsen. No stock was exchanged, no money commingled, no equipment given over. IM Steel's business was different. It had its own location. It was different from Belsen and GST in every way that mattered. Did it sell to Manitoba? No. Manitoba Cranes was a burning customer. GST had an operation called Burning where in addition to selling different types of steel... So once the companies were liquidated, IM Steel didn't do business with the customers that his clients secured? Now that I can't say because there were a number of customers. But the main customer that the plaintiffs had always complained about was Manitoba Cranes. And you can say IM Steel did no business with them after the... Yes, I can because IM Steel was never in the burning business. They never sold burned parts. And that's what Manitoba Cranes was in the business of purchasing. And that's what the plaintiffs were in the business of doing. That was their sales work for GST. That represented $75,000 of the $128,000 due to them. I believe it was more than that, actually. But that was a contract that ended up never being completed, never fulfilled. And that wasn't because of decisions made by Mark Posner. That happens after the assignment. Now that was another area where the ASSIGNEE didn't follow Mark's advice. Mark's advice was to keep going more than the ASSIGNEE did and to pay the salespeople. That's the testimony in the case. Mark advised the ASSIGNEE, you don't have to pay your salespeople. They're the people that make the sales and bring in the money. Counsel, that's two minutes. What the evidence showed was that Mark Posner was able to continue in the steel business and the plaintiffs were not. And that's a shame. The plaintiffs did work here. In a just world, they would have been paid for. But what happened was the bank came in, refused to extend the line of credit. The companies couldn't continue. And then Mark Posner was able to continue in the steel business by fronting a whole lot of his own personal money and taking out big loans with Cole Taylor Bank. That's why he was able to make it through. The settlement agreement. The plaintiffs wanted to use the settlement agreement to show fraud here. But there was nothing wrong with the settlement agreement. Everything was done above board. And what the settlement agreement shows you, the clearing fact it shows you, the trial court found important, is that the secured creditor did not get paid in full. The bank walked away without satisfaction. The unsecured creditors were not going to be paid here. And that wasn't Mark Posner's decision. It certainly wasn't something that he knowingly permitted, which is the standard under the Act. The interesting thing about the settlement agreement is GST and Belson to this day have never been released. That settlement agreement doesn't release GST and Belson. The secured creditor wasn't paid in full. And so it's a shame that the plaintiffs' work was not rewarded. But it didn't create a cause of action against IM Steel or Mark Posner. The trial court's finding should be affirmed. Thank you. Thank you, Mr. Olmstead. Mr. Riggs, some rebuttal? Thank you, Your Honor. First, I'd like to comment on some of what you just heard. IM provided its own working capital. Absolutely false. You can look at the nine months later, nine months after they did the equipment sale, IM gets a loan from Cole Taylor Bank. You can see it on Exhibit 0-1. It's referred to in Exhibit Q, which is a settlement agreement. Nine months later, they finally, the money comes in to Mark Posner to buy or to pay for the equipment purchases. Basically Wait a minute. Let me just be fair. If I go out and borrow money to fund something, it's my money because the bank's going to make me pay it back. Aren't they providing their own working capital if they're borrowing money to do it? No. No. Why? The, during this entire time from May 7 to whenever the, what, a year later or something when they finally did the, what they call the IM settlement, IM has used all this equipment. They haven't paid a dime for it. They go out then and they get a, and basically you had an auction where IM did not have to pay cash. They didn't pay for it. They didn't pay for it until a year later. And basically if you read the terms of the auction, the auction calls for cash or a secured letter of credit. IM's the exception. They don't have to pay that assignee. That's an argument, Judge. What, let me ask you, what portion of the $128,000, is that the right number, $128,000? What portion of that is from contracts that were never completed or how much of that? I think I broke out. Contracts never completed, it's like $74,000. You don't have to look at, you don't, you don't have to waste your time. Yeah, I have it here, Your Honor. It's $74,028.76. That was commissioned from Manitowoc. Those were accepted purchase orders. My clients didn't have to do another thing. He simply canceled them out and that's after, you know, a year and a half of working to get that client. They gave him that first order for $1.3 million and that was their commission on it. He just closed them out. Yeah, it was more profitable for him to do his ABC and work it the way he did. Now, so what I'm saying is IM did not provide its own working capital. They did this and then a year later they go to Cole Taylor and they pay, all this money went to American National Bank and to an account, if you would, and they didn't have to put their piece in for their inventory, for their asset purchases until about a year later, or excuse me, nine months. They used it free for nine months. And that was contrary, that's not in the terms of the auction. Everybody else had to pay cash, not IM. Client said something, reams of paper all out in the open. You know, if you go through, we lay it out in our brief, but we interviewed Mr. Posen. He told us that the trustee took all our accounting records. We don't know where they are. We can't give you any accounting records. We never got accounting records. Nothing was out in the open. Nothing was all hidden. They want to, the assignee ignored Mr. Posen. You know, that's their argument. How about, now that's when it comes to the equipment sale. But let's talk about, they're selling all this inventory now. They're paying IM a 35% commission to buy this inventory at 20% below market, all right? I mean, that's not something, that's not a public deal. Think of that and then go back and think of how they did the inventory, or the asset sale. It is the same thing. They just took advantage of everybody. Here, here's a summary. IM Steel received the inventory, the accounts receivable, the equipment, the business of both GST and Belson. They eliminated $9,700,000 in unsecured debt. They eliminated $5,800,000 in, excuse me, that was secured debt. $9,790,000 in secured debt, $5,800,000 in unsecured debt. They incurred for that whole transaction, they incurred $823,000 in debt to Cole Taylor Bank. Just, it's incredible what they did with these companies. There was nothing fair about it. When he says IM didn't get a penny, you have a document here where IM at the end, IM is paid $1,081,000. Just everything he says is just, and if you read the cases that dealt with the fiduciary director's duty, if you would, dealing and being on both sides of the transaction, your honors, I think that you will send this case back. Thank you. I have a quick question. Oh, I'm sorry. Mr. Olmstead said that IM operated at a different location, but on page four of your brief, you indicate IM operated at the same location with the same employees. I think ultimately that, as I recall, sometime after the, they did during the ABC, and during that ABC, which took, I don't know, nine months or so, IM is selling its product also. It started, as I say, it started almost simultaneously. And then I think ultimately it got, they sold the land, and I think IM did move somewhere else. But it's right in the, it's in the same area, right on Route 50. IM wasn't incorporated until May 4th. Well, that's when they, that's on May 4th, their attorney is signing, he's trying to execute the articles of incorporation. He's asking, you know. So for them to continue to use the equipment that they bought, was the equipment housed in the same facility? Oh, yeah. It never moved. Yeah, they just. Because this is large equipment. This is large, right. So they didn't buy it and take it somewhere. No. They bought it and left it there. And if you think about it, we're talking about, they have, they show $5 million as book, amortized book value, all right? That's what we're talking about on the balance sheet. But that, Belson had been in business for years. There was no like, you know. What equipment did IM start with? Very, it's broken out on one of these schedules where I show you the combined balance sheets. But basically, it's primarily Belson's equipment. And I guess what I'm saying is IM took at least 75% of the equipment. And then there was another million out of the sale. IM bought 75%. And there's another million dollars in equipment that came up missing. Did that equipment that didn't come up missing, was it used as collateral to secure the loan, say, later, obtained? Yes. Yes. Yeah. To Cole Taylor, yes. All right. Thank you, judges. All right. Thank you, Mr. Ridge. Thank you both for your arguments here this morning. The matter will be taken under advisement. The written disposition will be issued, we hope, shortly. And right now, this court will be in brief recess.